15-2242, people v. Leonardo Gonzalez. All right. Can the attorneys on Gonzalez please approach the podium? Identify yourselves for the record. Good morning. Good morning, your honors. My name is Harina Megani Wakely. I'm an assistant state's attorney representing the people of the state of Illinois. Thank you. Good morning, your honors. My name is Carl Munt. I'm with the Office of the State Appellate Defender, and I represent Mr. Gonzalez. Okay. Mr. Munt, did you want to reserve time for rebuttal? Just a few minutes. So it'll be 15 minutes each side. I'll give you 12 minutes on the opening and then three for rebuttal, but we tend to go over in this division. So you can have a seat, and Mr. Munt, you can proceed. Mr. Munt, you were once an expert in my office, were you not? I was, your honor. Okay. So I just want to make that disclosure. Make no difference to me who's arguing the case. Does anybody have an objection to Justice Gordon hearing the case based on that? Ms. Megani Wakely, any objection? Great. Thank you. You may proceed, Mr. Munt. And we will try not to hold you a prior externship against you. May it please the Court, your honors? Counsel? Your honors, in this case, the State presented a weak case based solely on unreliable eyewitness evidence from two incredible witnesses. Isn't it something for the trial court to determine whether the eyewitnesses were credible, whether they sufficiently established the elements that the State needed? How can we possibly evaluate their credibility on appeal? It is true that the charge of a fact is entitled to make credibility determinations, but, your honors, you do not represent every credibility determination. Your honors have an independent duty to evaluate the record and determine if no reasonable fact finder could have found these people credible. For example, Nicholas lied repeatedly on the stand, was called out for lying, and simply just changed his testimony on multiple occasions throughout this. And the problem in this case, your honor, is not only the State presented a very weak case, but a series of mistakes from defense counsel and the trial court prevented the defense from presenting evidence that would have undermined the State's case and that would have impacted the jury's credibility determination in this case. Ultimately, that's the problem, is the jury was presented a one-sided view and was not presented with a bunch of evidence that would have undermined the identifications and the credibility of Nicholas and Alejandra. Well, your first issue here is really whether they should have allowed him to display his tattoos. Is that correct? That is one of the issues presented in this case. Did you lay a foundation for that? I'm sorry? Was a foundation needed for the tattoos? In order to simply display them? No. So no foundation is needed. If you're just doing a display, you can do whatever you want in the courtroom. Is that your position? If the State had wanted to challenge the foundation, perhaps outside the presence of the jury, they could have asked Mr. Gonzalez about his tattoos. So it's up to the State to object. Otherwise, the defendant gets to do whatever he wants as a display. And the trial court has no role as the guardian there. I don't believe anyone ever objected. Unless the State objects, is it your position that the defense can do whatever they want and the trial court has no role as a guardian of that evidence? It's not evidence, Your Honor. That's the point. It's a display of his physical characteristics. Okay. If it's not evidence, what are you trying to do with this display? You show the jury the tattoos. That would be evidence, counsel. I think you mean it's not testimony. Yes. Thank you. It's not testimony. It's not evidence in the traditional sense of an object. So therefore, you believe that you need no foundation? Oh, if the State chooses to object to the foundation. Let me stop you for a moment. Let me stop you for a moment. In evidence was the photo at the time of the defendant's arrest, was it not? There was a photo from the lineup. There was a photo from the lineup. Okay, from the lineup. Okay. And that photo from the lineup showed tattoos. Maybe not depicted exactly, but it showed he had tattoos on his hands. I don't recall if you could see his hands, but you could certainly see tattoos on his arms. That is correct. Well, you can actually see something on his hands, but more significantly, correct me if I'm wrong, the crime occurred in July, beginning of July, 4th of July, whatever. But then he wasn't really arrested or identified until August 6th. So we're talking about a month and three days. Correct. And that's what the record shows, right? Yes. So he wasn't arrested the next day or anything like that. The guy was in the hospital, wasn't he, the victim? He was in the hospital for about a day. Okay. But the defendant wasn't arrested that day. There was no lineup photo taken that day. There was a photo taken about a month and three days, give or take. That's correct. All right. And would that photo be somewhat of a foundation if a foundation was required? Yes, if the defense were required to lay a foundation for this, that photo is a foundation. Or, like I said, outside the presence of the jury, the state could have simply asked the defendant when he got the tattoos. Or, as we saw in the hearing – The state could have asked the defendant when he got the tattoos without the defendant taking the stand? How could they possibly do that, Mr. Mundt? It's simply the way of foundation, Your Honor. So he's not testifying, but he's giving testimony. Well, there's a difference between testifying in substantive evidence to a trial or fact and proceedings outside the presence of the jury. Would he be sworn for that? Presumably, yes. So he would be sworn and he would be asked questions, but he would not be subject to cross-examination? Well, as to the foundation – What authority do you have for this proceeding that you are alleging could have occurred? It's not uncommon, Your Honor, for the parties to discuss the admissibility of evidence If it can be a stipulation, yes. But what you're suggesting is they get to ask the defendant questions without the defendant being sworn and he's not subject to cross-examination on that? I don't recall I said he was not being sworn, Your Honor. So he'd be sworn, he would answer questions, but he would not be subject to cross-examination? It would be limited to the scope of the foundation of the tattoos, Your Honor. Were you going to say other ways to – As you saw in the post-trial – Isn't that what the trial court asked for? At that time, no. The trial court told them that they couldn't do that that way, the way they were trying to do it with a display, but that they would have an opportunity to say when the tattoos were. Didn't the trial court ask them different questions that gave them an opportunity to get that evidence in? I think he hinted at the possibility there could be other ways to do it, and that brings – But did they do that? They did not, which is why I raised an ineffective assistance of counsel claim for not presenting – for not finding a different way to present this evidence when it was so important to his theory. So how did the court abuse its discretion when it gave them clues, in your words, on how to get it in and they didn't do so? How did the court abuse its discretion in not allowing the tattoo evidence in? Those are separate questions, Your Honor. The initial legal decision that the court made that you were not permitted to display your body without subjecting yourself to cross-examination is simply incorrect legally. The law is clear. Defendants may display themselves. That is not testimony. That is not covering the Fifth Amendment. Therefore, they're not subject to cross-examination on that. The judge's legal decision on that matter was error. Now, your point about offering other possibilities, that could go to an argument about the prejudice or the impact of the judge's decision. But that does not change the fact that his legal decision is simply incorrect. Now, the judge did offer other alternatives, and defense counsel did not take advantage of those. As I said, that's why I raised an ineffective assistance of counsel claim as to that particular point, that even though counsel was trying to get this evidence of the tattoos in, and it was very important to his theory, he kind of just gave up. And he made some comment of, well, it's in the last photo, they can see it, but didn't pursue it anymore. At the hearing on the post-trial motions, Leonardo's sister testified about the tattoos. Leonardo testified about the tattoos. Oh, what did the sister say at the post-trial? Regarding the tattoos. I believe they both testified that he had those same tattoos that the defendant was arrested, and that they were not new tattoos. The two tattoos on his hands were the names of his daughters. Yeah, so at the post-trial hearing, that was the motion for a new trial. Correct. And actually, there was testimony then, as you just pointed out, where the defendant himself, and we didn't throw him to the side, but his sister testified that he did have the tattoos at the time of the alleged offense. Perhaps that's correct. And so, you know, perhaps that's a foundation there in itself. But for the motion for a new trial, there was other evidence that there were possibly three alibi witnesses that were never called, correct? Yes. Plus, there were two women that testified that they were in a party, and at the party, the victim said to them, he's really not the guy that shot at me, but I'm not going to do anything unless the family pays me money. Correct. So you have the two people saying this, and then you have the three alibis that never were called, and then you have some evidence at the hearing about the tattoo, and the judge, well, denied the motion for a new trial. But your position, at least one of your arguments, is that the court abused its discretion in denying that motion for a new trial. Correct. That's correct. You have multiple issues. First, you start with reasonable doubt, and you argue that the testimony was just two eyewitnesses but no physical evidence, nothing else. And you also argue ineffectiveness. Yes. You also argue the tattoo should have been allowed, and then you also argue that a motion for a new trial should have been granted. Correct. And in your reasonable doubt, you are asking for an outright reversal because you say the evidence is fairly weak. Right? Yes, that's correct. Okay. All right. But of all the arguments, well, I don't want you to have to categorize them, but that would summarize your arguments, wouldn't it? Yes. Four major arguments. Yes. Those are the four major arguments. Okay. And as Your Honor so kindly pointed out, I appreciate it. Is this your first time arguing? It is not. Oh, okay. Well, I just thought I'd ask. If not, I haven't been present for one of your oral arguments. Welcome. Thank you. Go ahead. As you pointed out, three alibi witnesses testified at the post-trial motion hearing, and they all testified that they were available and willing to testify the trial, but Mr. Birch did not call it. In terms of Rosario, the grandmother of Leonardo's children, she testified that she called Mr. Birch several times and she never received any response from him whatsoever, and she actually showed up to the last day of trial, and at that point he said something along the lines of, where have you been? It's too late. He, on the other hand, testified that he called her once, maybe twice, never got a response, and so he just kind of gave up. And then in addition at the hearing, Mr. Birch explained that throughout the course of his investigation in this case, he was aware of or Leonardo told him that a potential alibi was that he was smoking marijuana and having sex with Rosario, the grandmother of his children. Now, Mr. Birch testified he did not believe this alibi, and so he chose not to pursue it. And part of his decision not to pursue that was that, according to Mr. Birch, there was a police report that said that Ariel, the mother of Leonardo's children, said that he wasn't home at the time. But there's no indication that he personally spoke with Ariel or got any of the context of that state. Instead, he relied on that one line in the police report to simply abandon the idea of presenting an alibi defense. And it is our position that without investigating and actually speaking to any of these witnesses, it's unreasonable to not pursue an alibi defense without actually interviewing any of the potential alibi witnesses, especially given the fact that these so-called three alibis, as the state referred to them in the proceedings, were not contradictory, as the state tried to point out there. All of them occurred within the same household on different floors of the house. So it's entirely possible that when Ariel said he was not here, it was because he was upstairs and she didn't know where he was. He was playing video games, as the others testified. So the fact that Mr. Birch never interviewed these witnesses, he simply didn't have enough information to make a reasonable decision of whether or not to pursue an alibi defense. Another part of his explanation was that he chose to pursue the misidentification, the tattoos, instead. However, he didn't have to choose one of them. An alibi defense and misidentification defense go hand in hand. Part of the way you can show that the misidentification occurred is that he had an alibi. He wasn't there. He could not have been the person. Therefore, he misidentified him. So the fact that counsel made a statement that he sort of chose one over the other, that also is evidence that it was unreasonable. Would that be per se unreasonable, that you pursued one defense, as opposed to bringing them both forward? I don't know that you could say it would be per se unreasonable. It would depend on what counsel knew, the facts before them. Well, let's say you have a misidentification and you don't bring forward your alibi. In that situation, would it be ineffective? It would depend very much on having spoken to the alibi witnesses, evaluating the strength of their testimony. I don't believe you could ever do it without knowing what the people would say, given the facts of the case. But here, he didn't even bother to interview them to ascertain what they would testify to. In addition, as Your Honor pointed out, there were two witnesses who testified to newly discovered evidence of actual innocence at the hearing on motion from your trial. Those two witnesses explained they were at a party and a person they didn't know, a friend of a friend, essentially, that we now know as Nicholas, made statements that he had been shot, but the person who was in jail was not the person who shot him, and that he was trying to get money from that person's family in order to drop the charges. It is our position that that testimony was sufficient for the judge to grant a motion from your trial based on newly discovered evidence of actual innocence. Now, the record demonstrates that the court did not analyze their testimony under the standards of a motion from your trial based on newly discovered evidence. He explained that he was evaluating it as part of the Strickland claim, the ineffective assistance of counsel claim. And when the court makes an error of law in that regard, don't we review that to move to NoVo instead of for abuse of discretion? If the court makes an initial error in how he's reviewing his claim? I suppose you would, yes, since there's not really any discretion to be reviewed at that point since they weren't answering the proper question. Yes, I would agree with that. In addition to the judge not evaluating on the correct legal standard, his final attacks were simply contradicted by the evidence. Well, what standard did he use? Refresh my memory again. It's not entirely clear. It certainly seemed like he was doing it as part of a Strickland claim related to the other witnesses. He made some comment along the lines of it wouldn't have been unreasonable for counsel to not call on him. As opposed to going through the elements for a typical motion for a new trial based on actual innocence. Correct. Not once did he ever say anything along the lines of asking that natural innocence claim or evaluating whether it was newly discovered material and not cumulative of such conclusive character or changed the outcome. None of those tests of the actual innocence standard ever came up. And that's why that's one of your arguments on appeal is that the motion for a new trial wasn't considered properly in light of the evidence that was presented at the motion. Correct. And in addition, his findings of fact were against the evidence. He stated that from his recollection of the evidence, the witnesses all know each other, and so of course they would have known that the person at the party was the person who was shot by Mr. Gonzales. And the fact they waited to come forward, he found that important and determined that they were not fair. However, there's zero evidence to support that. The two witnesses testified that they did not know Nicholas, the victim, Mr. Montenegro. Could I interrupt you for one moment? Sure. There was never a motion to suppress the line of identification. Was there? There was not. Okay. And when you – within your reasonable doubt argument, you're arguing that the identifications were weak, but also that – what's the next two different sort of – that the officers had incorrectly suggested to the witnesses that the defendant, the shooter, was going to be in those lineups? That was part of it, yes. Just that the circumstances of the identifications were suggested. Okay. All right. But there was never any motion to suppress those identifications? There was not a motion filed. But the circumstances lend themselves to an argument that there was some suggestiveness and perhaps unreliability of those identifications. Which was the basis of your reasonable doubt argument. That's correct. The reasonable doubt argument, I believe, proved the evidence was insufficient, but in addition to show just how weak the State's case was in this case. The evidence is closely balanced. And so in any of these issues where plein air is coming – where plein air comes up, we have clear order of law and we have closely balanced evidence. And under SEBI, as this Court knows, that's all that's required to reverse under plein air. Sure, but on your motion for a new trial, you don't have to claim any plein air because you made a motion for a new trial. And it was – so that is in the record. There's no need to – that's not based on any plein air. That's correct. The tattoo argument was raised under plein air. Sure, sure. But the motion for new trial arguments, yes, I don't believe those are – It's preserved. Those are preserved. That's correct. Mr. Minn, I know you wanted to save some time for rebuttal, so I'll give you another minute and then wrap this portion up, please. Your Honor, as stated, because the State's case was so weak and due to the mistakes of defense counsel and the trial court, the defense wasn't allowed to present evidence that would have undermined the State's case. And for those reasons, Leonardo was denied a fair trial. And for the reasons stated in our brief, we ask this Court to reverse this conviction outright under the first issue. Alternatively, remand for a new trial under the others. Thank you, Mr. Munn. Ms. McGonigal-Wakeley. Good morning again, Your Honors. Harina McGonigal-Wakeley, Assistant State's Attorney for the people of the State of Illinois. First, I'd like to address Justice McBride's question regarding the standard to be used in this case regarding the ruling on the motion for new trial. In context, when one reviews the trial court's ruling on the motion, it's clear that he used the proper standard. And all of his rulings on that motion were correct, and this Court should review it for an abuse of discretion. With respect to any misunderstandings or any verbiage that may have shown that he didn't use the proper standard, I would direct this Court's attention to, again, the wordings that were used. And at one point, yes, Justice Gaynor, in going to another portion of the motion for new trial argument, did use prong as the word, which kind of led into thinking that he wasn't using an actual innocent standard but was kind of doing it under Strickland. But it's clear from the ruling that he not only applied the Strickland standard properly when judging the ineffective assistance claims, but also that he did do an actual innocence analysis. He did not use the magic words that Ortiz uses with respect to the different things, but clearly was going towards the due diligence and the newly discovered when he talked about the two witnesses that are at issue with respect to the actual innocence claim. So I just wanted to... Did he say that they weren't newly discovered? He mentioned... I mean, the alibi, the two women that were at issue. Yes, Rosa, yes. He mentioned the fact that... He didn't acknowledge the absolute, didn't he? It was new because it was coming forward. And, in fact, it came forward after the trial was held. And, in fact, it was raised by Counsel Birch himself, the one who is being claimed to be ineffective by Counsel Fulton in the other portions of the motion for new trial. And so he did bring that forward. But he heard the testimony at the hearing from these women. And they testified that this conversation that they allegedly heard or had with Nicholas took place in April of 2013, even before the trial evidence started, which started in May. And they didn't come forward with their affidavits until after trial in December. I believe it was 2013 or 2014, but it was after trial. And that they only came forward after they spoke to the sister who said, could you write an affidavit? And he heard all this evidence. And he said the suspicious nature of them coming forward, the timing, the fact that everybody knew each other. It wasn't a situation where even though they claimed, we had no idea he was talking about defendant when he was saying this. Well, as Judge Gaynor properly found, based on his listening to the testimony and observing their demeanor and gauging it, that they were not, their veracity was questionable with respect to that. Again, and then going back to the specifics of the timing, that there was no due diligence, which is one of the portions of actual innocence. So with respect to that, any ruling that is reviewed by this Court, what the people's position is, it should be for an abuse of discretion standard. Okay. With respect to, and I'll go back to the sequential. With respect to displaying of the hand tattoos, Judge Gaynor properly used his discretion. Did you agree that for display that the defendant did not have to establish any foundation? I absolutely disagree. This was demonstrative evidence, and the trial court is the gatekeeper of what evidence is presented. Could the jurors have seen the tattoos as he was sitting at counsel table? And they did. And that was exactly what Judge Gaynor addressed in the motion for new trial with respect to ineffective assistance of counsel for not pursuing that particular tattoos, the hand tattoos. And the judge made a clear record based on the testimony that, I mean, the jury saw a defendant throughout the trial. His hands, his arms were covered based on the motion for new limine trial, you know, ruling, but his hands were open. Isn't the case law that a demonstration such as this is not testimonial in nature? And then while the state can certainly do it in their case in chief, if they lay a foundation, they could have the defendant do some sort of a display, correct? Yes. All right. So likewise, can't the defendant also be permitted to have a display of evidence without having to testify if he lays a proper foundation? Yes. And if he lays the proper foundation, and that's exactly what Judge Gaynor- That was certainly part of his reasoning. Yes. That there was no foundation. But he did go a little bit further when he said, well, the state isn't going to be able to really challenge the foundation if he doesn't testify. But he also, in his ruling, did certainly suggest there's not a foundation right now. Right. And that was what, in context, his ruling was based on the need to lay a foundation, and that one way to do this was after the sidebar, which was not on the record, and an objection, that one way was for a defendant to testify so that the state could cross on the items for the foundation that they would be entitled to do so. I'm going to stop here for a moment. Didn't the victim testify during the case of the tattoos? The victim was asked questions regarding that on cross-examination. And he noticed it at the time of the offense. He said he noticed something.   The arm tattoos. The arm tattoos. Yes. I'm sorry. Are we talking about items? Yes. He clearly testified that he saw arm tattoos. But when he was asked on cross-examination specifically regarding, well, isn't it true that there were hand tattoos that you didn't see? And Nicholas said, I saw something. I didn't know what they were. And that's at the point where a defense counsel asked the defendant to stand up so that the jury could see his hands while Nicholas was on the stand, and an objection was waged and a sidebar was had. And after the sidebar, based on the discussions that were had, the trial court made it clear to the parties that a foundation needed to. But when he said, you know, I saw something, I didn't know what it was, you take that together with the picture, which was a month later showing the tattoos on the hands. Isn't that a proper foundation? No, because the relevancy of what was being sought to be established was that these tattoos existed at the time of the shooting. And one month had passed from the time of the shooting to the arrest. And the lineup photo that was presented to the jury and they were able to see took place at the time of arrest, not at the time of the crime. And so the foundation that needed to be laid was that he had these tattoos at the time of the offense. And based on. But the victim said he saw something on the hands. He just didn't explain what it was. But the defense counsel was presenting his lack of clarity on that issue to show that defendant had these tattoos and anyone would have been able to see it. And in order to do that, he had to show the relevancy that they were actually there. And that's what the entire discussion was about, that the foundational requirement was that they were there. And did you say this came up in the middle of the trial? It came up in the middle of the trial when Nicholas was on the stand during cross-examination. And, again, after being asked. So the judge was asked to make the call in the middle of the trial as opposed to pre-trial where there could have been a discussion about what can come in, what can't come in. Right. Well, and there was a sidebar. I mean, there was an objection at that point. And so there were some discussions. But it was never a subject of the motion in limine. No, it was never a subject. And the subsequent to the trial, it was the sister testifying at the motion that she would testify that her brother had these tattoos at the time. Your Honor, by the way, that occurs after the trial. That was not something counsel suggested to the judge in the middle of the trial that would have perhaps been a foundation. Your Honor, my reading of Sister Nancy's testimony was, yes, she was asked a question about the tattoo. And the question was prefaced with, did he have these tattoos at the time of his arrest? And she said yes. Okay. Whereas defendant, when he testified at the hearing, clearly testified I had these tattoos at the time of arrest, but I also had them at the time of the crime. And so the only evidence based on my reading of the record that was presented at the motion for new trial that showed that he had these tattoos was him testifying. And so, you know, and again, defense counsel explained his reasoning for not possibly pursuing that was based on if defending got on the stand. And I believe the motion for new trial hearing does support that there was only one person who possibly could have done this. He believed the abandonment, I thought, was that he believed that that would kick open the door to gang evidence. Yes, that was something that went in his mind. He said he was remembering the motion in limine, the discussions about the tattoos, the other tattoos, the arm tattoos, and the possibility that that could open up the door for further testimony. And it might not be limited only to the hand tattoos. But, you know, when the defending gets on the stand and is talking, one can't control what goes on in cross-examination and the cross-examination may have opened up the door. Not necessarily would have, but may have. And that was something he took into consideration in deciding whether to pursue this. Plus, with respect to the prejudice of, first of all, not displaying it in open court and or for counsel not pursuing it, I mean, again, the jury saw the defendant in open court, saw his hands, and had the opportunity to see. I don't know that they were supposed to be using that evidence when the judge says to them, anything that's been stricken should not be considered by you. I mean... But it wasn't, the judge never said on the record, first of all, that directing the jury to strike anything, it was more... But when the issue came up and counsel asked for the defendant to stand right as that testimony was coming out, you don't think the jury could discern that they were not supposed to pay attention to that? Your Honor... Even though he didn't give them that specific instruction. As soon as the issue came out, there's an objection, a sidebar, and then they move on and never talk about it again. And that could have happened, but by the same token... What do you recall the initial IPI and closing IPI say about the evidence that you're to consider comes from the testimony or the witness you've heard? I forget. It's been a while. Your observances of the witnesses... I know. I haven't said it on the tip of my tongue, but... You're to use your common sense, you're to use your... But I don't think they're supposed to be taking something that they haven't even... It's never been addressed to them. Well, Your Honor, it was truly addressed to them during the cross-examinations of all of the witnesses, and I... I want to go to something else. Okay. I'm emotional for you. Okay. You've got an eyewitness identification. This is a case that is not based on any physical proof. True? True. Yeah. I mean, you have two eyewitnesses. You have two eyewitnesses. And then you have... You know, there's an argument made that... Well, she said something about she realized she knew him from high school. They both identified them. And there was some arguments made about the police told them beforehand, you know, we've got a suspect. They said... And they said that. They actually agreed with that. But then later, it was shown that they signed those forms that said we were not told that a suspect was a suspect. And then you've got... You've got... Well, you have no physical evidence. Okay. But now you have... You've got the tattoo that really isn't coming in. But at least if there's a foundation laid, there could be evidence where a demonstration could be made. And then you've got three alibi witnesses post-trial. And you've got two women at a party that are challenging the victim's testimony because they said they were present when he said that's not really the guy. And then you have this situation about where his car was rammed and he didn't want to talk about that. And then there was some effort to put in evidence about that night. The police had talked to someone who said that night that the car was rammed, a witness. Do you remember that part? Unnamed witnesses at the scene had been spoken to. Those are all the things that are coming up at the motion for a new trial. Correct? I don't believe the hearsay statements of the unnamed witnesses actually arose at the motion for a new trial. Okay. But the two alibis, the three different people, two women that said, you know, I heard him say this at the party, no physical evidence. The court didn't allow the tattoo evidence, although there's a question about foundation. So what is the standard we look at for the judge for that? Abuse of discretion. What is the actual terminology we use when we describe abuse of discretion? Whether it's arbitrary or fanciful or no reasonable person would have taken the view adopted by the trial court. And in this case, under that standard, the answer is that the trial court's ruling should be affirmed. With respect to the reasonable doubt argument, yes, there were two eyewitnesses who positively identified defendant. And that evidence, now that's been presented below, should be looked at in the light most favorable to the prosecution at this stage. And it proved guilt where one eyewitness was face-to-face and one knew the defendant. The jury was charged. We'll get to that later. Well, those factors, which the jury heard, the jury vetted everything that defense is presenting before this court. And basically, you know, we wouldn't see these cases, but are there that many cases out there where you actually have an eyewitness or two? No physical evidence, no fingerprints, no gun, nothing. And then you have a trial, and then you've got three alibi witnesses and you have the two people that said he said this at the party. And then you've got some other questions about the identification. You think that that's not a case where a new trial maybe should have been granted? Absolutely not. Because, again, it's not a cumulative kind of thing. One needs to look at whether error has occurred at each part. And in this case, there was no error in either of those parts. Would you call these two eyewitnesses, like, unwavering, never contradicted, never impeached? Are we talking the actual innocence or alibi? We're talking about the eyewitnesses at trial. Oh, I'm sorry. I apologize. No, you know what? There were weaknesses in their identification that was explored by the defense counsel with respect to, well, did you talk about the hand tattoos to the police? And as Nicholas explained, I saw something. I didn't say anything because I didn't know what they were. I mean, Alejandra, it was developed that she recognized the defendant from high school, didn't know him, but recognized him, and that she didn't mention this to the police. But by the same token, they were cross-examined on this, and they also, the jury heard this and also heard Alejandra. They didn't hear any of the evidence that was presented at the motion for a new trial. We have three alibi witnesses, two new witnesses that said he contradicted his identification. But again, and then turning to the alibi witnesses, you know, these alibi witnesses, first of all, based on the testimony that was developed at the motion for a new trial, which was reviewed by Judge Gaynor, that Julian and Victor, two of the people who would have testified that the defendant was with him playing video games, I mean, admitted on the stand, they never said this before. The first time that they're mentioning this is at that hearing on cross-examination. And so they never, even though they knew the defendant like a brother, based on their testimony, the love that they had for him, they never went to his trial, never told counsel, never told the police, never told anybody for that matter, and that this alibi was being first heard after he's convicted and at the motion for a new trial. With respect to Rosario, which is the grandmother of defendant's babies, I mean, the defendant claimed he was having sex with Rosario and smoking weed with her as his alibi to counsel when they were preparing for trial. But he had told the police that I was watching the baby during that time. And Rosario did not say the same thing, that I was having sex. Rosario said, well, I was with my boyfriend, and I was with Victor, and I was with defendant and my other son, and I went to bed and they were playing video games. Now, I know counsel makes a big to-do about, well, everybody was talking about the same house. We were in the same house. Well, no, there was then Ariel who was talking about the fact that defendant was not in that house. And she didn't just say that I didn't see him in the house that day. She said he hadn't been there for several days. She hadn't seen him in the house. And so when counsel, and again, it came up under an ineffective assistance claim at the motion for a new trial, and Judge Gaynor applied the proper standard, did a strict analysis, reviewed that strategic decision. Was counsel ineffective for not raising an alibi defense? And found that counsel would have been reasonable in view of the inconsistencies, the differing, and the fact that it would have been impeached and thoroughly undermined by officers and Ariel at trial. And so based on that, you know, Judge Gaynor's decision on the motion for new trial, on that ground, was entirely correct and should be affirmed. The same thing with respect to the two actual innocents. Judge Gaynor, again, looked at it under the purview that it was being presented, actual innocents. And their testimony, even putting aside the due diligence that they didn't come forward until after our trial, was not conclusive. Was not conclusive of the nature that was warranted. I mean, at most it was impeached. Let me ask you one question, though. Would you agree that high school years are very impressionable for people? Yes, I have a son who's a senior right now. We understand that. And would a reasonable person who sees somebody who commits an offense against them or relative fail to tell a police officer that the person was somebody they went to high school with? Wouldn't that be kind of strange? Well, it's, and again, everybody reacts differently to whatever pressures or stressors there are. But the average reasonable person would say, I went to high school with him. Well, Alejandra was asked why she didn't say it. And she gave her explanation. I had just seen my boyfriend gunned down, and I was scared. And she said that when asked a specific question. Now, it was for the jury as the trier of fact and the credibility to watch her as she said this and for them to, again, their own, as Justice Gordon is asking, what their experiences would be. Would that be so contrary to what they're thinking? And it was for them to decide. And they had everything in front of them to make their credibility determination. And it was not, and this Court should not substitute their judgment for the trier of fact. I mean, for all the reasons stated here, as well as those argued in our brief, we respectfully ask that the conviction be affirmed. Thank you very much. Ms. Fremont, the State had some extra time, so you can have some extra time on the rebuttal. I just have a few brief points. As your Honor was just discussing, Nicholas and Alejandra did not provide the most important piece of their identification. The tattoos and that she recognized them from high school, they never told the police that before the trial. The most unique piece of information that could have led to an identification of the suspect, they didn't give to the police. They said it for the first time at trial. That undermines their identification. With regard to the alibi witness claim, contrary to what counsel said, the claim is about a failure to investigate the alibi witnesses. It is not solely a claim of failing to call the alibi witnesses. And the failure to investigate, the fact that he never interviewed them at all, sets it apart from the decision of what witnesses to call, which can sometimes be a question of character. So is it your position that we have to analyze that as the failure to investigate the alibi? It's somewhat irrelevant, or it's the next step, finding out what the alibi actually would be and how contradicted they would be. And he was obligated to investigate that alibi. Is that your position? Yes. The case law, including Strickland itself, says you have to at least know enough information before you can decide whether or not to pursue something. He didn't even get enough information to decide whether or not it was reasonable to not pursue an alibi defense. And regarding the two witnesses who testified about the composition of the party, they did not know each other. There is no evidence that they knew Nicholas other than he was some guy at a party at this one time. So the jury's finding that the reason they didn't come forward sooner with suspect is simply not based on any evidence presented. And your Honor mentioned the tattoos at the table. The trial court specifically said Leonardo wore long sleeves throughout the trial, so they would not have seen any of the tattoos on his arms, and some of his hands may have been covered up. But more importantly, as your Honor pointed out, the jury was instructed to consider only the evidence presented, which consists only of the testimony of the witnesses and the exhibits which the court has received. So the jury would have specifically been told not to consider just what they observed on Leonardo's hands. And as to the foundation for the tattoo question, as Justice Gordon was getting at, Nicholas's testimony that he saw some tattoos made part of a foundation for the fact that Leonardo had tattoos on that day. And Leonardo may have been able to lay a foundation. The fact that the cyborg was off the record when it came later, we're not going to get to see exactly who made what arguments, but the state can waive a foundation objection. It's possible the state may not have objected to the foundation of this, at which point Leonardo wouldn't have been able to display his tattoos. So the record is a bit unclear in terms of who objected to what, when, and how that was resolved, since the parties made a later record of the cyborg that had happened before. And for those reasons, we ask that this court reverse this conviction or remand it for a new trial. Thank you. Thank you, Mr. Monkey. The court will take the matter under advisement and issue an order as soon as possible. Thank you both.